**GOVERNMENT EXHIBIT 1**

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
55 EAST MONROE ST., SUITE 1900
CHICAGO, IL 60603

NIJC
WOLFE-ROUBATIS, ELENI
208 S. LASALLE ST., STE. 1818
CHICAGO, IL 60604

IN THE MATTER OF          FILE A 75-052-990          DATE: Feb 13, 2008
AL-BAREH, LOUI HASHIM

__ UNABLE TO FORWARD - NO ADDRESS PROVIDED

X ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE. THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:    BOARD OF IMMIGRATION APPEALS
                      OFFICE OF THE CLERK
                      P.O. BOX 8530
                      FALLS CHURCH, VA   22041

__ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS. IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                      IMMIGRATION COURT
                      55 EAST MONROE ST., SUITE 1900
                      CHICAGO, IL   60603

__ OTHER: _____
_____

                                         _____
                                         COURT CLERK
                                         IMMIGRATION COURT                FF
CC: THOMAS J. O'MALLEY, ASST. CHIEF COUNSEL (DHS)
    55 E. MONROE STREET, STE.1700
    CHICAGO, IL,  606030000

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
DETAINED IMMIGRATION COURT
CHICAGO, ILLINOIS

File: A75-052-990                                          Date: February 13, 2008

In the Matter of:                         )
                                          )
   Loui Hashim AL- BAREH                  )   IN REMOVAL PROCEEDINGS
                                          )
       Respondent.                         )

CHARGE:       Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A))ii) — Conviction of an Aggravated Felony.

APPLICATIONS:   Section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3) — Withholding of Removal.

Protection under Article 3 of the United Nations Convention Against Torture.

ON BEHALF OF THE RESPONDENT:    ON BEHALF OF THE GOVERNMENT:

R. Linus Chan, Esq.                 Tom O'Malley, Assistant Chief Counsel
National Immigrant Justice Center      Department of Homeland Security
208 South LaSalle St., Suite 1818       55 East Monroe St., Suite 1700
Chicago, Illinois 60604                   Chicago, Illinois 60603

## DECISION OF THE IMMIGRATION JUDGE

### I. BACKGROUND

The respondent is a 41-year-old male who is a native and citizen of Iraq. On or about December 12, 2000, respondent adjusted his status to that of a lawful permanent resident of the United States. On June 8, 2007, the Department of Homeland Security ("the government" or "DHS") initiated removal proceedings against the respondent by filing a Notice to Appear ("NTA") charging that he is removable under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or "the Act"). Exhibit 1.

At a hearing on June 27, 2007, the respondent, through counsel, admitted the factual allegations contained in the NTA and conceded removability as charged. The DHS also submitted a record of conviction showing that respondent was convicted of wire fraud in the United States District Court for the Northern District of Illinois. Exhibit 3. Based on the

A75-052-990                             1

admissions and the evidence submitted, I find that alienage and removability have been established by clear and convincing evidence, as required by Section 240(c)(3) of the INA, 8 U.S.C. § 1229a(c)(3). The respondent declined to designate a country for removal and indicted that he would be seeking withholding of removal. The respondent filed an application for withholding of removal under Section 241(b)(3) of the INA on form I-589. Exhibit 2.

## II. EVIDENCE PRESENTED

### A. TESTIMONIAL EVIDENCE

The respondent, the respondent's former supervisor, Yong Sang Yi, and the respondent's friend, Abdul Hamid Al-Shawi, testified on August 16, 2007. The following summarizes their testimony.

1. <u>The Respondent's Testimony</u>

The respondent is a native and citizen of Iraq. The respondent is a Shiite Muslim and was born in the village of Mudana, Iraq, a predominantly Shiite town, with a population of approximately 300,000. Mudana is approximately four hours by car from Baghdad.

In 1979, the respondent's uncle was arrested. After his arrest, he disappeared and was never seen again. The respondent believes that Saddam Hussein, the former leader of Iraq, arranged to have his uncle killed because his uncle disagreed with Hussein's regime.

In 1991, the respondent participated in an unsuccessful Shiite uprising against the Hussein regime. After the uprising, the respondent left Iraq and went to a refugee camp in the Saudi Arabian dessert. According to the respondent, the conditions at the camp were very poor but there were approximately a hundred people at the camp who opposed the Hussein regime and the respondent found some friends.

The respondent left the camp in 1997 and came to the United States as a refugee. Initially, the respondent worked as a dishwasher at a restaurant in Florida and then later moved to Lincoln, Nebraska. Prior to his arrest by Immigration and Customs Enforcement, the respondent resided in Elkhart, Indiana. In 2000, the respondent adjusted his status to that of a lawful permanent resident.

Sometime in 2002, the respondent's brother asked the respondent to temporarily run his store in Chicago, Illinois for several months. The respondent stated that his brother needed a temporary store manager because his brother wanted to travel to Syria to get married. The respondent agreed and moved from Elkhart, Indiana to Chicago and ran the store in his brother's absence. In December 2002, the police came to the store and took the respondent's name and social security number. In December 2002 or January 2003, the respondent's brother returned from Syria and the respondent returned to Elkhart, Indiana.

In 2005, the respondent was hired by a government contractor to work as an interpreter for the United States Army in Iraq. In April or May 2005, the respondent was sent to Iraq and

A75-052-990                                        2

lived on a base located in Baghdad. The respondent testified that he was still afraid to live in Iraq but felt reassured knowing he would be living on a United States Army base. The respondent indicated that he wanted to help the United States government because he opposed Saddam Hussein's regime and supported the United States government's actions in Iraq. While living on the base, the respondent's mother and brother came to visit him, but he was prohibited from leaving the base.

The respondent served as an interpreter during interrogations of suspected terrorists. The respondent testified that he was in the same room with individuals subject to interrogation, and as a result, each of the suspects saw his face and heard his voice. Several men from his city recognized him and indicated that they knew where he was from, although the respondent did not know their names. The respondent worked as an interpreter seven days a week and estimated that he served as an interpreter for hundreds of detainees. The respondent did not witness any detainees being beaten or tortured during interrogations. While serving in Iraq as an interpreter, he was never arrested. The respondent indicated that he loved working as an interpreter.

The respondent returned to the United States before the end of his contract because he needed to undergo security clearance. After he returned to the United States, he was arrested and charged with fraud in connection with an Illinois Link Card fraud scheme conducted at his brother's store. The respondent acknowledged that he knew his brother was involved in a fraud scheme, and although his brother initiated the scheme, the respondent agreed to participate.

The respondent claimed that he used the money obtained through fraud to buy supplies for the store, and never used the money for personal benefit. The respondent's brother later sold the store; however, the money from the sale was frozen. The respondent pled guilty to wire fraud under 18 U.S.C. § 1343 and was sentenced to 18 months in prison. Exhibit 3. He served 16 months of his sentence and was released early on good behavior with three years of probation. Exhibit 3. In addition, the respondent was ordered to pay restitution to the government in the form of 10% of his salary. Exhibit 3. The respondent's brother is still in prison.

The respondent believes that if he returns to Iraq, his life will be in danger because he would be recognized as an interpreter and killed. In addition, he believes that members of the Hussein regime know that he supported the 1991 Shiite uprising and, although Saddam Hussein is dead, his supporters are still alive.

The respondent spoke to his family four months prior to the hearing, and at that time, his brother, sister and mother were living in Mudana. The respondent believes that it is more dangerous for him to be in Iraq than his family because he opposed the Hussein regime and worked for the United States Army. The respondent stated that his life would be in danger throughout Iraq because various people throughout the country knew of his assistance to the United States.

    2.  Testimony of Yong Sang Yi, the respondent's supervisor

Officer Yi testified via telephone from Ft. McPherson, Georgia. Officer Yi is a Chief Warrant Officer Two (CW2) who was in charge of the 3rd infantry Division, 2nd Brigade

A75-052-990    3

Interrogation facility in Baghdad. Exhibit 7, tab C. While in Iraq, Officer Yi worked personally with and supervised the respondent. Exhibit 7, tab C.

This witness also testified that the respondent worked as an interpreter at a detention facility located inside the U.S. Army base and that he personally worked with the respondent about ten times, as the officer in charge of interrogation. Officer Yi estimated that the respondent had face to face contact with approximately 70 to 100 detainees. Officer Yi confirmed that respondent was not allowed to leave the base because of security reasons, as well as to prevent interaction with local Iraqis. He stated that security was in place to prevent attacks during interrogations and if the respondent had been attacked, it would have been brought to his attention.

On October 15, 2005, Officer Yi submitted a letter in support of respondent's application for citizenship. Exhibit 6, tab C. Officer Yi stated that he was not aware that the respondent had been convicted of fraud.

    3.    <u>Testimony of Abdul Hamid Al-Shawi, respondent's friend</u>

Mr. Al-Shawi is a native of Iraq. He came to the United States in 1996. He is a United States citizen and lives in Mishawaka, Indiana. Mr. Al-Shawi is a close friend of respondent. The respondent and Mr. Al-Shawi knew one another from the elementary school where the respondent's father was the principal. They became friends as teenagers and their friendship deepened while they both were in the refugee camp in Saudi Arabia.

Mr. Al-Shawi was a student in Iraq and is a Shiite Muslim. He opposed the Hussein government in 1991 and participated in the 1991 Shiite uprising, although he was not a leader of the rebellion. During the uprising, Mr. Al-Shawi assisted in taking control of government offices in the city of Basra. He helped take control of a building where the regime detained individuals, some of whom were relatives and friends, but Hussein's soldiers had already left.

After the 1991 rebellion, Mr. Al-Shawi requested refuge from the United States Army. The United States Army had forces in Kuwait and took Mr. Al-Shawi to Saudi Arabia. Mr. Al-Shawi indicated that he chose to leave Iraq because he believed he would face death or imprisonment if he stayed. In Saudi Arabia, Mr. Al-Shawi was classified as a prisoner of war and taken to a camp for prisoners of war from Kuwait. After a year in the camp, he was able to change his status to refugee. Mr. Al-Shawi remained in the camp for nearly six years, living in a tent. During this time, he and the respondent were reunited. He acknowledged that he did not have any proof to show that he was taken in as a refugee.

In September 1996, Mr. Al-Shawi left the camp and came to the United States as a refugee and lived in Phoenix, Arizona. Later, in 1997, the respondent also left the refugee camp and came to the United States. Mr. Al-Shawi and the respondent kept in contact by telephone. Eventually, Mr. Al-Shawi left Arizona and followed the respondent to Indiana to work in a factory

The respondent came to Mr. Al-Shawi seeking advice about returning to Iraq as an interpreter. Mr. Al-Shawi advised the respondent that interpreting was a good job because he could serve both countries and he might have a better future in the United States if he had worked for the United States Army. Mr. Al-Shawi believes many Iraqis returned to Iraq to interpret for the United States government because they wanted to assist in removing Saddam Hussein from power and earn a living. Mr. Al-Shawi stated that the respondent has always supported the United States mission in Iraq. The witness indicated that respondent fully supported the United States removal of Saddam Hussein from power.

Mr. Al-Shawi believes that if the respondent returns to Iraq, he will be harmed. In 2006, Mr. Al-Shawi returned to Iraq and was imprisoned. He approached a checkpoint and was asked for identification and he provided his Iraqi identification card. The guards searched him and discovered his United States passport and subsequently imprisoned him. Mr. Al-Shawi was not charged with any crime and his family was able to get him released

Mr. Al-Shawi testified that he did not return to Iraq until 2004 because it was too dangerous. When he did return, he wore customary Iraqi clothes. He visited Al-Medina, where his family lived, and several other cities but was always accompanied by one or more family members for safety reasons. The witness also testified that if he returned to Iraq again, it would only be for a visit because the country is so unstable.

According to Mr. Al-Shawi, if the respondent returned to Iraq, many would believe the respondent was wealthy because he worked for the United States Army. The respondent might be kidnapped for ransom or killed by a militia that opposes the United States military presence in Iraq. Mr. Al-Shawi indicated that many Iraqis do not like Iraqis who moved to the United States and are often resentful of such individuals. He is confident that Iraqis would know that the respondent was involved in the Shiite uprising and that he worked for the United States government.

B. DOCUMENTARY EVIDENCE

Exhibit 1: Copy of Notice to Appear dated June 8, 2007; Exhibit 2: Form I-589, Application for Asylum and Withholding of Removal dated June 26, 2007; Exhibit 3: Documents submitted by Department of Homeland Security relating to judgment in respondent's wire fraud case, including: statement of criminal judgment, documents stating respondent's term of imprisonment and supervised release, conditions of supervised release, statement of criminal monetary penalties, criminal docket, statement of indictment for charge 1, charges 2-5, statement of forfeiture allegation, government's response to defendant's sentencing memorandum, and order of dismissal; Exhibit 4: Notice of Pre- Hearing Statement dated July 11, 2007; Exhibit 5: Notice of Individual Hearing dated July 11, 2007; Exhibit 6: Respondent's Pre-Hearing statement and respondent's index of documentation as well as supporting documents, tabs A-P; Exhibit 7: Respondent's Motion to Allow for Telephonic Testimony and supplemental country conditions dated August 14, 2007; Exhibit 8: State Department Country Report on Human Rights Practices in Iraq released by the Bureau of Democracy, Human rights, and Labor on March 6, 2007.

## III. APPLICABLE LAW & LEGAL ANALYSIS

### A. ASYLUM

The respondent is statutorily ineligible for asylum due to his conviction for an aggravated felony. Section 208(b)(2)(A)(ii) of the Act provides that asylum is not available to aliens "having been convicted by a final judgment of a particularly serious crime." This provision is amended by INA section 208(b)(2)(B)(i) which specifies that "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime." A conviction for a wire fraud involving a loss to the victim of at least $10,000 is an aggravated felony by the terms of INA Section 101(a)(43)(M). The respondent concedes that the crime he committed is an aggravated felony and that he is not eligible for asylum.

### B. WITHHOLDING OF REMOVAL

Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), provides that an individual may not be removed to a country where his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. To be entitled to withholding under Section 241(b)(3) of the INA, the respondent must demonstrate a "clear probability" that such persecution will occur in the country of removal, i.e., that it is "more likely than not." See INS v. Stevic, 467 U.S. 407 (1984) (withholding under former Section 243(h) of the INA); see also 8 C.F.R. § 1208.16(b). This burden of proof is higher than that required for asylum. See INS v. Cardoza-Fonseca, 480 U.S. 421 (1987). If an applicant establishes the requisite risk of harm, withholding of removal is mandatory, rather than discretionary. See INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A).

As with asylum, if the applicant establishes past persecution, it shall be presumed that there is a clear probability that he or she will be persecuted in the future. 8 C.F.R. § 1208.16(b)(1). It then becomes the Government's burden to rebut the presumption by showing a fundamental change in circumstances or, alternatively, that internal relocation is a reasonable option. Id.

1. Particularly Serious Crime

Although the respondent is statutorily ineligible for asylum, he remains eligible to request withholding of removal under section 241(b)(3). See INA §§ 208(b)(2)(A), (B). However, under § 241(b)(3)(B) of the Act, an applicant is statutorily ineligible for withholding of removal if he or she has been convicted of an aggravated felony and sentenced to an aggregate term of imprisonment of at least five years or if he or she otherwise has been convicted of a particularly serious crime. In determining whether an offense is particularly serious, the court considers the nature of the conviction, the sentence imposed, the circumstances and underlying facts of the conviction or convictions and whether the type and circumstances of the crime indicate that the alien will be a danger to the community. Matter of Frentescu, 18 I&N Dec. 244 (BIA 1982).

Because the respondent was sentenced to an aggregate term of imprisonment of less than five years, he is not presumed to have been convicted of a particularly serious crime, for

purposes of withholding of removal, and is entitled to an individual examination of his conviction, the sentence imposed, and the circumstances and underlying facts of his conviction. See Matter of Aldabesheh, 22 I&N Dec. 983, 990 (BIA 1999). The nature, facts, circumstances and sentence imposed in the respondent's criminal case were all presented to the court.

In analyzing whether respondent's conviction was for a particularly serious crime, I will examine the facts presented. The respondent was convicted of one count of wire fraud under 18 U.S.C.A. § 1343 with a loss greater than $10,000. Exhibit 3. He was sentenced to a term of 18 months in prison, given 3 years supervision, and ordered to pay over $240,000 in joint and several restitution. Exhibit 3. While the amount of money involved in the fraud was substantial, and it involved a huge fraud against the United States government, these facts alone do not render the offense particularly serious. Indeed, the sentence of eighteen months imprisonment while not insignificant does not indicate that the criminal court considered the offense to be a serious one. There is no evidence that there was any force or violence used by respondent or any of the other conspirators in committing the offense. The facts indicate that while respondent was a willing participant, he did not initiate the crime, but he knowingly went along with his brother's scheme.[1] Based on the evidence presented, the court concludes that the respondent's crime was a serious offense that indicates a lack of character and that he does not appreciate the tremendous opportunity he was given when he was allowed to enter the United States. However, based on the totality of the evidence, I conclude that the respondent's conviction did not involve a particularly serious crime. Therefore, respondent may request withholding of removal.

### 2. Past Persecution and Changed Country Conditions

Respondent claims that he has suffered past persecution. An applicant for asylum and withholding of removal bears the burden of establishing past persecution or a clear probability that the respondent will be persecuted on account of a protected ground. While neither the INA nor the relevant case law provides any hard and fast definition of what constitutes persecution, the Seventh Circuit in a succession of cases has both described and limited this term. Persecution encompasses "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate," including such actions as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." Firmansjah v. Gonzales, 424 F.3d 598, 605 (7th Cir. 2005) (internal quotations and citations omitted). While non-life-threatening violence can constitute persecution, Marquez v. INS, 105 F.3d 374, 379 (7th Cir. 1997), the mistreatment must rise above "mere harassment," Sofinet v. INS, 196 F.3d 742, 746 (7th Cir. 1999).

An applicant who is found to have established past persecution shall also be presumed to have a well-founded fear of future persecution on the basis of the original claim. See 8 C.F.R. § 1208.13(b)(1); Ambati v. Reno, 233 F.3d 1054, 1060 (7th Cir. 2000). The regulatory presumption may be rebutted if the Government establishes by a preponderance of the evidence

---

[1] The respondent's claim that he did make any money from the fraudulent scheme but only used the proceeds for purchasing store inventory is not supported by any objective evidence. The amount of money stolen during the period the respondent ran the store makes this claim difficult to believe.

A75-052-990                                7

that either: (1) there has been a fundamental change in circumstances in the country of removal, such that the applicant no longer has a well-founded fear of persecution on account of one of the enumerated grounds; or (2) the applicant could avoid future persecution by relocating to another part of the country and under the circumstances, it would be reasonable to expect the applicant to do so. See 8 C.F.R. § 1208.13(b)(1)(i), (ii). In cases in which the persecutor is a government or is government-sponsored, it shall be presumed that internal relocation would not be reasonable, unless the Government establishes by a preponderance of the evidence that under all circumstances, it would be reasonable for the applicant to relocate. 8 C.F.R. § 1208.13(b)(3)(ii).

The Seventh Circuit has "recognized the hard truth that unpleasant and even dangerous conditions do not necessarily rise to the level of persecution." Mitev v. INS, 67 F.3d 1325, 1331 (7th Cir. 1995). The Seventh Circuit has also concluded that far more severe harm than that inflicted on the respondent did not rise to the level of persecution. See e.g. Dandan v. Ashcroft, 339 F.3d 567, 573-74 (7th Cir. 2003) (finding that kidnapping, detention for three days without food and beatings that caused facial swelling does not compel a finding of past persecution.); Zalega v. INS, 916, F.2d 1257, 1260(7th Cir. 1990)(upholding BIA's determination that alien had not been persecuted despite four years of intermittent searches, arrests and detainments). The 7th Circuit has also found "that actions such as detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture might cross the line from harassment to persecution." Ciorba v. Ashcroft, 323 F.3d 539, 545 (7th Cir. 2003). (quoting Mitev v. INS, 67 F.3d 1325, 1331, internal quotations omitted). "However, recognizing that these sorts of activities *might* rise to the level of persecution is not the equivalent of saying that they always do. . . . Review of an applicant's past experience must be carried out on the most specific level-it is the details that reveal the severity of the particular situation." Mei Dan Liu v. Ashcroft, 380 F.3d 307 at 313 (7th Cir. 2004). (emphasis in original).

Respondent stated that his uncle disagreed with Saddam Hussein's regime and respondent believed this dissent was the reason for his uncle's disappearance in 1979. Respondent, who is a Shiite, testified that he participated in an unsuccessful uprising against the Hussein regime in 1991 and that he then fled Iraq. Respondent cited to various media reports that indicate Hussein's regime killed Shiites indiscriminately after the 1991 uprising. In a cursory fashion respondent asserts that this amounts to past persecution.

The respondent here has not presented any evidence of past mistreatment or harm. There is no presumption of future persecution unless the respondent established past persecution. Respondent states that he left Iraq in the wake of the failed uprising fearing that the former government of Iraq would harm him. Fortunately for the respondent, he was able to avoid arrest and he escaped to Saudi Arabia. Later, respondent was able to come to the United States. The respondent obtained entry to the United States based on his future fear and not based on past mistreatment. As it is the respondent's burden to establish past mistreatment his application and testimony do not establish past persecution.

In assessing whether an applicant has met his burden of proving future persecution, 8 C.F.R. Section 1208.13(b)(2)(iii) indicates that in some circumstances country conditions can become so severe that a pattern and practice of persecution is created. Where such a pattern and practice is established and an alien shows membership in the persecuted group, an applicant can

A75-052-990                                                8

meet his burden of establishing a well-founded fear of future persecution without having to establish that he would be singled out for persecution. But such membership does not establish each member of the group has individually been persecuted in the past. Therefore while it is reasonable to conclude that respondent had a well-founded fear of future persecution during Saddam Hussein's reign, this does not prove respondent's past experiences *per se* constituted past persecution. On the evidence presented to this court, respondent has failed to meet his burden of establishing past persecution.

Even if respondent is credited with having established past persecution, the court finds that there has been a fundamental change in country conditions. It is well settled that administrative agencies and the courts may take judicial (or administrative) notice of commonly known facts. Therefore, this court may properly take administrative notice of changes in foreign governments. See Matter of R-R-, 20 I&N Dec. 547, 551 n.3 (BIA 1992). Even assuming *arguendo* that the respondent suffered persecution at the hands of the government of Iraq (a fact not supported by this record), there has been a fundamental change in country conditions. "Ordinarily a person persecuted by a regime that later collapses does not have a well-founded fear that he will be persecuted should he return, and so asylum is denied." Niam v. Ashcroft, 354 F.3d 652 (7th Cir. 2004); Useinovic v. INS, 313 F.3d 1025, 1032 (7th Cir. 2002).

It should be noted that respondent is **not** contending that country conditions have not changed in Iraq since 1991. Indeed, it would be difficult to imagine anyone making such a claim with regard to Iraq. It is almost universally acknowledged that there has been a fundamental change in country conditions in Iraq.

After conducting an individual assessment of the evidence it is clear that this change in government establishes that the basis for respondent's previous fear no longer exists. Respondent established that he is a Shiite Muslim and that the former Iraqi government, under Saddam Hussein and the Ba'ath Party, was dominated by Sunni Muslims. These are all historical facts which are borne out by the evidence in the record, as well.

Respondent does not dispute that Saddam Hussein and the Ba'ath Party are no longer in power in Iraq. This fundamental change in country conditions makes it abundantly clear that even if respondent established that he suffered past persecution, the presumption of future persecution has been rebutted. The respondent's own witness testified that he took part in the same 1991 Shiite uprising. The respondent's witness has gone back to Iraq and never suffered any repercussions from the 1991 uprising. A vast majority of the Iraqi population is quite happy that Saddam Hussein's reign is over. The other evidence of record shows that there is very little likelihood respondent would be harmed in Iraq today for taking part in the 1991 Shiite uprising.

The respondent has failed to establish that these occurrences rise to the level of persecution "on account" of one of the enumerated factors in the Act. Based upon a careful review of the record as a whole, including the respondent's testimony and the documentary evidence, the Court finds that the respondent has failed to establish that he has suffered past persecution based on one of the five enumerated grounds in the Act.

3. <u>Clear Probability of Future Persecution</u>

As stated previously, in order for an applicant who has not suffered past persecution to be eligible for withholding of removal pursuant to section 241(b)(3) of the Act, the alien must demonstrate a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion. See INS v. Stevic, 467 U.S. 407 (1984); Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987). The applicant must establish that it is more likely than not that he would be subject to persecution on account of one or more of the five enumerated grounds. See id. The burden of proof to establish eligibility for withholding of removal is higher than that required for asylum. See INS v. Cardoza-Fonseca, 480 U.S. 421 (1987).

An applicant such as the respondent, who has not established past persecution, must show that his fear of future persecution is both subjectively genuine and objectively reasonable. See, Mitev v INS, 67 F.3d 1325, 1331 (7th. Cir. 1995). "Merely alleging a fear of future persecution is not enough." Sharif v. INS, 87 F.3d 932, 935 (7th Cir. 1996). "In order to demonstrate a well-founded fear, a petitioner must present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution. Zulbeari v. INS, 963 F 2d 999, 1000 (7th Cir. 1992).

The respondent claims that there is a clear probability that he will be persecuted if he is returned to Iraq on account of his religion, political opinion and particular social group. An asylum applicant under the lower well-founded fear standard must show that his fear of future persecution is both subjectively genuine and objectively reasonable. See Mitev v INS, 67 F.3d 1325, 1331 (7th. Cir. 1995). Even under that lower burden of proof, the Seventh Circuit has held that the objective component criterion requires the applicant to present specific detailed facts showing a good reason to fear that he will be singled out for persecution. Sayaxing v. INS, 179 F.3d 515, 520 (7th Cir. 1999)(citations omitted). Put differently, "the applicant must present *specific evidence* that his encounters with the government were of such a magnitude and frequency that they would cause a reasonable person to fear being singled out for persecution." Id. (emphasis in original).

The Seventh Circuit reiterated that "[t]he United States does not insure aliens against unrest ... in their homelands." Kobugabe v. Gonzales, 440 F.3d 900, 902 (7th Cir. 2006). The Court also emphasized, in accordance with the Supreme Court's decisions in Stevic and Cardoza-Fonseca that "the applicant for withholding of removal bears the burden of demonstrating that loss of life or freedom is more likely than not." Kobugabe v. Gonzales, 440 F.3d 900, 901 (7th Cir. 2006).

The alien must produce evidence from which it is reasonable to conclude that the harm was motivated, at least in part, by an actual or imputed protected ground. Matter of S-V-, 22 I&N Dec. 1306, 1309 (BIA 2000); Matter of S-P-, 21 I&N Dec. 486, 489-90 (BIA 1996). The alien need not provide direct proof of a persecutor's motive, but must provide some evidence, either direct or circumstantial, of those motives. INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992). An immigration judge is not required to accept the respondent's speculation as to the motivation of the alleged persecutor. See Ziu v. Gonzalez, 412 F.3d 202 (1st Cir. 2005)(citing

Khalil v Ashcroft, 337 F.3d 50, 50, 55 (1st Cir. 2003))(noting that the respondent's theory regarding his alleged persecutor's motives was just that, a theory).

### i. Religion and Political Opinion

Here, respondent left Iraq in 1991. The respondent has not established that it is more likely than not that he would be persecuted on account of religion or political opinion. As indicated in the discussion of respondent's past persecution claim, there is little likelihood that respondent's past opposition to Saddam Hussein's regime would result in persecution today. As for the claim based on religion, the majority of the population of Iraq holds the same religious belief as respondent. Therefore, although respondent claims a religious fear, it is not an objectively reasonable fear. The fact that both Sunni and Shiites commit acts of violence against each other does not establish that if the respondent returns he has even a well-founded fear based on religion. Respondent's status as a Shiite who opposed Saddam Hussein puts him in the same position as the majority of Iraqis. Iraq is a dangerous place, but it is dangerous for all Iraqis. The respondent religious fears are based on general conditions of violence that affect all Iraqis. Margos v. Gonzales, 443 F.3d 593 (7th Cir. 2006)(holding that an Assyrian Christian in Iraq did not demonstrate a well-founded fear of future persecution).

### ii. Membership in a Particular Social Group

The Board of Immigration Appeals ("BIA") has held that members of a particular social group share "a common, immutable characteristic" that "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." See Matter of Kasinga, 21 I&N Dec. 357 (BIA 1996); Matter of Acosta, 19 I&N Dec. 211, 233 (BIA 1985); Matter of H-, 21 I&N Dec. 337 (BIA 1996). The BIA also recently discussed that a particular social group can be distinguished by its "social visibility." Matter of C-A-, 23 I&N Dec. 936 (BIA 2006).

The Seventh Circuit Court of Appeals has set forth a three-part test for obtaining asylum based on membership in a particular social group. "[A]n alien must: (1) identify a particular social group; (2) establish that [he] is a member of that group; and (3) establish that [his] well-founded fear of persecution is based on [his] membership in that group." See Iliev v. INS, 127 F.3d 638, 642 n.3 (7th Cir. 1997) (quoting Sharif v. INS, 87 F.3d 932, 936 (7th Cir. 1996)). In Lwin v. INS, 144 F.3d 505, 512 (7th Cir. 1998), the Seventh Circuit indicated that in some instances family membership can form the basis of a particular social group.

I am most mindful that the Seventh Circuit has repeatedly stated that general dangerous conditions in the respondent's home country will not make out a claim. See Margos, 443 F.3d at 599; Kobugabe, 440 F.3d at 902. However, in discussing a particular social group claim in the context of generalized violence, the Seventh Circuit found that educated, landowning class of cattle farmers stood out from the general population because they were among the guerrillas' preferred victims. Tapiero de Orejuela v. Gonzales, 423 F.3d 666 (7th Cir. 2005). Tapiero de Orejuela involved a Columbian family who feared the FARC guerrilla group. Id. at 668. In the instant case, the respondent does not fear the Iraqi government *per se* but insurgent groups that he believes will target him and those similarly situated.

A75-052-990　　　　　　　　　　　　　　11

Respondent's claim of social group status because he has been in the United States is not viable because it is far too broad and sweeping to constitute a particular social group. However, respondent's claim that his specific service as a contract interpreter for the United States armed forces does provide a group of individuals with the common characteristics necessary to form a particular social group. As with the educated, landowning cattlemen in Columbia, the evidence presented by this respondent does indicate that interpreters working with the United States government have been targeted as preferred victims of insurgents in Iraq. While the government of Iraq is not directly involved in this targeting and in harming interpreters, little has been done to stop the mistreatment of interpreters in Iraq. Despite the great assistance and presence of over 100,000 American troops, the Iraqi government appears unable to stop this violence. The evidence here suggests that, unless the interpreters stay on the base, the United States Army cannot protect them.

Were this respondent eligible for asylum under the more generous well-founded fear standard, this claim would clearly meet the burden of proof. Respondent here has to establish that it is more likely than not that he will be identified as a member of the group and singled out as such. It is certainly possible that the respondent could go back to Iraq and never be identified as an interpreter. However, respondent need not establish that his persecution is absolutely certain; he need only establish it is more likely than not. In other words, respondent must show that there is more than a fifty-percent chance of his identification and persecution if returned to Iraq. In light of the country condition information presented, I find that respondent has met his burden of proof.

Respondent has included numerous articles detailing the danger faced by Iraqis who have worked with coalition forces. See Exhibit 6, tabs H – L. Among these articles are reports that interpreters are viewed by insurgents as traitors and collaborators, but the United States military has often been unable to provide additional measures to protect these individuals. Exhibit 6, tab H, see also UNHCR, GUIDELINES RELATING TO THE ELIGIBILITY OF IRAQI ASYLUM-SEEKERS, page 28 (2005). These individuals face a particularly high risk of retaliation due to the highly public nature of their positions.[2] Id. According to these articles, insurgent groups seek retaliation against these individuals even after they leave their positions as interpreters for coalition forces, international organizations, or private contractors.[3]

---

[2]  Congress has recently recognized the special immigrant status of interpreters who experience an "ongoing serious threat" because of their employment by or on behalf of the United States Government in Iraq. National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, H.R. 4986 § 1244 (2008).

[3]  Recently, an extensive New Yorker article detailed the struggle faced by former interpreters who are no longer safe in their native countries because of their recognized involvement with United States military forces. George Packer, Betrayed, THE NEW YORKER, March 26, 2007. The article details how interpreters find themselves "a person in between" who is no longer safe or welcome in his community but remains unprotected by the United States military. Id.

A75-052-990                                12

Respondent has adequately established that, due to his former position as an interpreter during interrogations, he faces a more-likely-than-not chance of persecution if he were to return to Iraq. The facts of this case indicate that respondent was personally identified by terrorist suspects in 2005 while working in his capacity as an interpreter, and there remains a strong probability that respondent would again be identified as such upon his return to Iraq. Respondent's former occupation makes him a member of a social group comprised of individuals who face a specialized danger because of their previous or current employment with coalition forces.

Based on the forgoing the respondent's application for withholding of removal will be granted.[4]

Accordingly, the following order will be entered:

### ORDER OF THE IMMIGRATION JUDGE

IT IS ORDERED that the respondent be removed from the United States on the charge contained in the Notice to Appear.

IT IS FURTHER ORDERED that the respondent's lawful permanent resident status is hereby terminated.

IT IS FURTHER ORDERED that the respondent's application for withholding of removal under section 241(b)(3) be GRANTED as to the country of Iraq..

GEORGE P. KATSIVALIS
IMMIGRATION JUDGE

---

[4] As I have determined that respondent has established eligibility for withholding of removal under § 241(b)(3)(B) of the Act, I need not rule on the request for withholding of removal under the torture convention.

A75-052-990                    13